Brian BRADY and Richard S. and Sharon Sue Incandela, as co-trustees of the Richard S. Incandela Trust, Plaintiffs,

v.

Carleton BURTT, Coy Eklund, and Floyd Kephart, Defendants.

No. 5:96–CV–165.

United States District Court, W.D. Michigan, Southern Division.

June 2, 1997.

Kenneth T. Brooks, Foster, Swift, Collins & Smith, PC, Lansing, MI, for Brian Brady, Richard S. Incandela, Sharon Sue Incandela.

Carleton Burtt, New York, NY, pro se.

Charles S. Mishkind, Miller, Canfield, Paddock & Stone, PLC, Grand Rapids, MI, for Coy Eklund.

Jon R. Muth, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, for Floyd Kephart.

H. Rhett Pinsky, Pinskey, Smith, Fayette & Hulswit, Grand Rapids, MI, for VFM.

## OPINION

QUIST, District Judge.

Plaintiffs, Brian Brady, and Richard S. and Sharon Sue Incandela, co-trustees of the Richard S. Incandela Trust, filed this action against Defendants, Carleton Burtt, Coy Eklund, Floyd Kephart, and Trivest Financial Services Corporation,[1] alleging intentional fraud, negligent misrepresentation, innocent misrepresentation, and conspiracy to defraud in connection with a stock purchase agreement. Now before this Court is Kephart's motion to dismiss for lack of subject matter and personal jurisdiction.

### Facts

In December of 1994, Insight Entertainment Group Ltd. ("Insight"), formerly known as Ventura Entertainment Group Ltd., acquired Soundview Media Investments, Inc. ("Soundview"). Insight specializes in entertainment marketing, electronic marketing, corporate communication services, and broadcasting. Soundview, as a wholly owned subsidiary of Insight, conducts the television broadcast activities of Insight.

At the time Soundview was acquired by Insight, Soundview was owned by Bennett Smith, Brian Brady, and Richard S. Incandela and Sharon Sue Incandela as co-trustees for the Richard S. Incandela Trust dated September 15, 1991 ("Incandela Trust"). At the time Soundview was acquired by Insight, Smith, Brady, and the Incandela Trust acquired Insight common stock, and Smith and Brady became employees of the broadcast division of Insight.

In June of 1995, Trivest Financial Services Corporation ("Trivest") acquired approximately twelve to fourteen percent of the common stock of Insight, which was a controlling interest in Insight. At that time, Coy Eklund was the Chief Executive Officer of Trivest and a director and officer of Insight and Soundview. Carleton Burtt was the Chief Operating Officer of Trivest and was also a director and officer of Insight and

---

1. In an Order dated March 4, 1997, this Court terminated Trivest Financial Services Corporation as a party.

Soundview. Floyd Kephart was an officer and director of Insight and Soundview.

After Trivest obtained a controlling interest in Insight, Insight needed additional working capital. Trivest agreed to invest approximately $7.6 million in Insight on the condition that Smith, Brady, and the Incandela Trust sell their interest in Insight and that Smith and Brady relinquish their employment contracts.

On July 22, 1995, Insight entered into a "Settlement, Release and Stock Purchase Agreement" ("Agreement") with, among others, Brady and the Incandela Trust. Pursuant to the Agreement, Insight agreed to acquire the Insight stock owned by Brady and the Incandela Trust. Brady was to receive a promissory note with an original principal balance of $264,445, and the Incandela Trust was to receive $500,000. Insight's obligations under the Agreement were to be financed with the money Trivest agreed to invest in Insight. The closing occurred in August 1995. At the closing, Brady and the Incandela Trust tendered to Insight all shares they owned in Insight. In return, Brady received notes and the Incandela Trust received notes and cash. After the closing, Insight was unable to pay the amounts owing on the notes given to Brady and the Incandela Trust.

On April 22, 1996, Brady obtained a default judgment against Insight in the United States District Court for the Western District of Michigan for the principal amount of his note plus costs, interest, and attorneys' fees. Furthermore, on July 23, 1996, the Incandela Trust obtained a default judgment against Insight in the United States District Court for the Northern District of Illinois in the amount of $360,801.45 including costs, interest, and attorneys' fees. Insight filed for bankruptcy in the United States District Court for the Middle District of Tennessee on September 18, 1996. To date, Brady and the Incandela Trust have been unable to collect on the judgments.

Brady and the Incandela Trust filed a complaint in this Court alleging that they entered into the Agreement based on fraudulent representations by Burtt, Eklund, and Kephart. They allege that Burtt, Eklund, and Kephart knew or should have known that Insight and Trivest could not perform under the Agreement, and that Defendants never intended that Insight or Trivest would perform under the Agreement.

Now before the Court is Kephart's motion to dismiss based on lack of subject matter jurisdiction and lack of personal jurisdiction.

***Discussion***

**1. Subject Matter Jurisdiction**

■ Kephart claims that the Court lacks subject matter jurisdiction in this matter. An action may be dismissed if there is lack of subject matter jurisdiction. Fed. R.Civ.P. 12(b)(1). A plaintiff bears the burden of establishing the existence of jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir.1991) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936)). Moreover, "in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen*, 935 F.2d at 1458 (citing *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 930 (6th Cir.1974)).

Kephart asserts that Donald Lifton, former general counsel for Insight, was intimately involved in the negotiation of the Agreement and thus figures as a non-diverse, indispensable party who must be joined as required by Federal Rule of Civil Procedure 19. Kephart claims that, as a result, this Court's subject matter jurisdiction, which is based on diversity of citizenship, would be destroyed since both Brady and Lifton are residents of Michigan.

■ Under Federal Rule of Civil Procedure 19, the question of joinder involves a three-step process. *Keweenaw Bay Indian Community v. State of Michigan*, 11 F.3d 1341, 1345 (6th Cir.1993) (citing *Local 670 v. International Union, United Rubber, Cork, Linoleum and Plastic Workers of America*, 822 F.2d 613, 618 (6th Cir.1987)). The court first determines whether a party is necessary and should be joined pursuant to Rule 19(a). *Professional Hockey Club Central Sports*

*Club v. Detroit Red Wings, Inc.*, 787 F.Supp. 706, 712 (E.D.Mich.1992) (citing *Local 670*, 822 F.2d at 618). If so, the court asks whether joinder is feasible, and, if it is, the party is to be joined. *Id.* If not, the court must determine whether the party is indispensable pursuant to Rule 19(b). *Id.*

In this case, even assuming Lifton was a necessary party to this action pursuant to Rule 19(a), joining Lifton is not feasible since it would destroy this Court's subject matter jurisdiction. Therefore, this Court must determine whether Lifton is an indispensable party pursuant to Rule 19(b).

■ "It is beyond peradventure that joint tortfeasors are not indispensable parties in the federal forum." *Lynch v. Johns–Manville Sales Corp.*, 710 F.2d 1194, 1198 (6th Cir.1983). *See also* 3A James Wm. Moore, Moore's Federal Practice ¶ 19.11 (2d ed. 1996) ("[t]ortfeasors are neither indispensable nor necessary since their liability is both joint and several."). Indeed, the advisory committee notes for Rule 19 state that "a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability .... [and][j]oinder of these tortfeasors continues to be regulated by Rule 20." Fed.R.Civ.P. 19 (advisory committee notes).

The complaint contains allegations of tortious conduct consisting of fraud and misrepresentation. Accordingly, Lifton, as an alleged joint tortfeasor, is not an indispensable party. Therefore, Lifton need not be joined, and subject matter jurisdiction based upon diversity of citizenship will not be destroyed.

## 2. Personal Jurisdiction

■ Kephart also claims that this Court lacks personal jurisdiction over him. An action may be dismissed against a defendant if there is a lack of personal jurisdiction. Fed. R.Civ.P. 12(b)(2). On a properly supported motion for dismissal for lack of personal jurisdiction, the court has three possible directions in which to proceed:

it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct

an evidentiary hearing to resolve any apparent factual questions.

*Theunissen*, 935 F.2d at 1458 (citing *Serras v. First Tennessee Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir.1989)). If a court relies solely upon affidavits submitted by the parties, a plaintiff need only make a prima facie showing that personal jurisdiction exists. *Theunissen*, 935 F.2d at 1458. In such a case, dismissal is proper only if all of the specific facts alleged by a plaintiff collectively fail to state a prima facie case for jurisdiction. *Id.* at 1459. Furthermore, a defendant may not avoid personal jurisdiction simply by filing an affidavit denying all jurisdictional facts. *Id.* (citing *Serras*, 875 F.2d at 1214).

In the instant case, no hearing is necessary because there are no issues of fact or credibility. *See Serras*, 875 F.2d at 1214 (holding that a court may exercise its discretion to hold an evidentiary hearing). Thus, the Court will decide the motion based solely upon the written materials submitted by the parties.

■ A federal district court, sitting in diversity jurisdiction, must apply the law of the forum state to determine whether it has personal jurisdiction over a non-resident defendant. *Theunissen*, 935 F.2d at 1459 (citing *Welsh v. Gibbs*, 631 F.2d 436, 439 (6th Cir.1980) and *In–Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 224 (6th Cir. 1972)). A federal district court has personal jurisdiction over a defendant if the defendant "is amenable to service of process under the state's long-arm statute." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992) (citing *Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104–05, 108 S.Ct. 404, 409–10, 98 L.Ed.2d 415 (1987)). However, the parameters of state law are limited by concerns of constitutional due process. *Theunissen*, 935 F.2d at 1459 (citing *Welsh*, 631 F.2d at 439). *See also Michigan Coalition*, 954 F.2d at 1176 (relying on *Chandler v. Barclays Bank PLC*, 898 F.2d 1148, 1150–51 (6th Cir.1990) and finding that "[u]nder Michigan's long-arm statute, the state's jurisdiction extends to the limits imposed by federal constitutional due process requirements and thus, the two questions become

one."). Therefore, this Court will first address any due process concerns that would limit the application of Michigan's long-arm statute.

■ In order to exercise personal jurisdiction, a federal court must determine whether "the facts of the case demonstrate that the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *Theunissen*, 935 F.2d at 1459 (quoting *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). A three-part test is used to determine whether the exercise of personal jurisdiction comports with the requirements of due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1299 (6th Cir.1989) (quotation omitted).

Plaintiffs have failed to show that Kephart, a resident of Tennessee, purposefully availed himself of the privilege of acting in Michigan or that Kephart caused a consequence in Michigan.

■ To determine whether a defendant has minimum contacts with the forum state the record must show that the defendant availed itself "of any of the benefits and protections'" of the forum state. *Michigan Coalition*, 954 F.2d at 1177 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985)). A defendant must have purposefully entered into a connection with the forum state "'such that he should reasonably anticipate being haled into court there.'" *LAK*, 885 F.2d at 1300 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)).

Insight is a Delaware corporation with its principal place of business in California. Soundview is a subsidiary of Insight with its principal place of business in Florida. Kephart, as Chief Executive Officer on behalf of Insight and as Chairman of the Board on behalf of Soundview, executed the Agreement with Brady, a Michigan resident. Plaintiffs argue that, because of this, Kephart should be subject to the jurisdiction of this Court.

■ In general, the activities of an officer on behalf of a corporation do not confer jurisdiction over the officer individually. *See Weller v. Cromwell Oil Co.*, 504 F.2d 927, 931 (6th Cir.1974) (finding that it would be unreasonable to permit suits against officers of national corporations because the officers could be sued in every state where they make telephone calls or write letters to job applicants) *See also Conti v. Pneumatic Prods. Corp.*, 977 F.2d 978, 983 (6th Cir.1992) (citing *Weller* in rejecting jurisdiction over a corporate officer). Furthermore, entering into a contract, without more, would not establish sufficient minimum contacts to subject a party to jurisdiction. *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 151 (6th Cir.1997).

■ Plaintiffs assert that prior to entering into the Agreement, Kephart was involved in the allegedly fraudulent negotiations of the Agreement and made telephone calls and sent letters to Brady in Michigan. In determining whether a party to a contract has purposefully availed itself of the forum state, a court must evaluate "'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Reynolds v. International Amateur Athletic Fed'n*, 23 F.3d 1110, 1118 (6th Cir.1994) (citing *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185). However, contract negotiations entailing telephone calls and mailings to the forum state, if random, fortuitous, and attenuated, are an insufficient basis for exercising personal jurisdiction over a defendant. *Conti*, 977 F.2d at 982–83. *See also Reynolds*, 23 F.3d at 1118–19 (finding plaintiff's residence as being merely fortuitous and any telephone calls and

letters to the forum state were not of such quality as to subject defendant to personal jurisdiction); *LAK*, 885 F.2d at 1300–01 (finding no personal jurisdiction over a defendant even though some letters were sent to plaintiff in forum state and contract was signed by plaintiff in forum state because such actions were merely a convenience to the plaintiff).

Plaintiffs submitted evidence that on June 7, 1995, Kephart sent a letter to Brady in Michigan along with a "Memorandum of Agreement." (Plaintiffs' Ex. C.) The letter requested Brady to review the proposed agreement, and stated, "[i]f the attached Memorandum of Agreement is consistent with your understanding, then I would request that you execute the Memorandum and initial each paragraph with which you are in accord [or] ... provide me with substitute language for our consideration." Also on June 7, 1995, Kephart sent a letter to Smith in Florida which letter made reference to the negotiations taking place with Brady. Kephart wrote also that "[d]uring the next few days I am sure that we will have several conversations with you, Brian, and Richard" regarding the Agreement. (Plaintiffs' Ex. K.) Smith also sent a letter to Kephart on June 7, 1995, discussing the negotiations that Insight was having with Brady regarding the Agreement. (Plaintiffs' Ex. L.) On June 8, 1995, Kephart sent another letter to Brady in Michigan which discussed in detail the negotiations that were taking place regarding the Agreement. (Plaintiffs' Ex. D.) On June 13, 1995, Brady sent a letter to Kephart discussing problems that Brady was having with Smith regarding the Agreement. (Plaintiffs' Ex. E.) The Court finds it is immaterial, however, that Kephart placed telephone calls and sent and received letters to and from Brady in Michigan. Such actions are " 'pre-

cisely the sort of 'random,' 'fortuitous' and 'attenuated' contacts that the *Burger King* Court rejected as a basis for haling non-resident defendants into foreign jurisdictions.' " *Kerry Steel*, 106 F.3d at 151 (quoting *LAK*, 885 F.2d at 1300 (referring to *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985))).

Furthermore, there is no evidence that Kephart intended to establish " 'continuing relationships and obligations' " in Michigan with Brady. *Kerry Steel*, 106 F.3d at 151 (quoting *Burger King*, 471 U.S. at 473, 105 S.Ct. at 2182–83). *See also CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1265 (6th Cir.1996) (finding jurisdiction over defendant where the parties' relationship was ongoing and not a "one-shot affair").[2]

Also, the subject matter of the Agreement or its performance had no connection to Michigan, therefore having no " 'realistic impact on the commerce of that state.' " *Kerry Steel*, 106 F.3d at 151 (quoting *Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d at 382). Even though Brady suffered financial losses, " 'the locus of such a monetary injury is immaterial, as long as the obligation did not arise from 'a privilege the defendant exercised in [the forum state].' ' " *Kerry Steel*, 106 F.3d at 151 (quoting *LAK*, 885 F.2d at 1303 (quoting *Hanson v. Denckla*, 357 U.S. 235, 252, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958))).

Therefore, Kephart's motion to dismiss for lack of personal jurisdiction will be granted.

### Conclusion

For the foregoing reasons, Kephart's motion to dismiss based on lack of subject matter jurisdiction will be denied. Kephart's

---

**2.** Plaintiffs argue that Kephart had other business transactions with Brady in Michigan which would subject Kephart to jurisdiction in Michigan. Plaintiffs refer to a letter dated April 3, 1995, from Kephart to Brady discussing an unrelated pledge of stock. (Plaintiffs' Ex. J.) Once again, however, such a letter is no more than a random, fortuitous, and attenuated contact that courts have rejected as a basis for personal jurisdiction. *See, e,g., Kerry Steel*, 106 F.3d at 151. Plaintiffs also refer to Brady's Employment Agreement dated November 4, 1994, entered into

with Insight and Soundview and referred to in the Stock Purchase Agreement. (Plaintiffs' Ex. B.) As this Court has pointed out, however, entering into a contract, without more, does not confer personal jurisdiction over a party. *See Kerry Steel*, 106 F.3d at 151. Furthermore, whether or not Brady's resignation was part of the Stock Purchase Agreement negotiations does not matter. Brady's Employment Agreement was terminable at will be either party and Insight could have terminated Brady's employment at any time, with or without Brady's resignation.

motion to dismiss based on lack of personal jurisdiction will be granted.